Clarence Bowen Allen v. City of New York Attorney Haley Kagan is that? Yes. Good morning, Your Honors, and may it please the Court. My name is Erica Haley Kagan, and I am here today on behalf of the appellants in this matter, the plaintiffs below, who are 11 individuals whose employment was terminated by defendants back in 2017. After extensive Federal litigation, the Federal Court did decide to dismiss all of plaintiffs' Federal claims. However, after doing so, plaintiffs respectfully submit that the Court should not have exercised supplemental jurisdiction over their State and City claims when, in fact, the Court did exercise supplemental jurisdiction and dismissed plaintiffs' disparate impact claims under the State and City law and disparate treatment claims under State law. And as we explained in the papers, this was improper for a number of different reasons. First — What is the standard of review on a district court's decision to exercise supplemental jurisdiction? So, Your Honor, we're asking that the Court exercise de novo review since the Court not only exercised the jurisdiction but then granted defendant's summary judgment. On the first part, whether to consider the merits of the State claims. Correct. What's the standard of review? So that is — that would be a question of whether or not they, you know, exercised improper discretion. So that would not be de novo review.  Abusive discretion. Thank you. Yes. Yes. And five years had gone by. Discovery had been completed. How was this an abusive discretion? Yes, Your Honor. So the problem here is that the Court applied Federal law, you know, Title VII and ADEA standards to the State and the City. That sounds like a substantive argument. I'm still focused on the exercise of discretion to exercise supplemental jurisdiction. I understand, Your Honor. And the abusive discretion lies in the fact that the Court believed that they were doing the most convenient, you know, making the most convenient moves, saving the State court the resources of hearing this matter. But the Court did send some cases, you know, did allow some case claims to proceed. And so we would argue that in terms of procedural fairness, the Court should not have exercised that discretion because the State court should be able to apply the State standards in order to allow the plaintiffs to have their day in court. And so if the Court, again, it's a bit wrapped up in the ultimate decision that was viable, then, of course, convenience would point us towards exercising such jurisdiction. But when there really are such different standards under Federal, State, and City law, the, you know, the convenience, the comity, judicial economy, it just really does not point towards an appropriate decision to exercise jurisdiction. Is that accurate, though, to say that there really are such differences between Federal and State law here? I mean, it's not — in both contexts, we're still dealing effectively with a burden-shifting framework that we've held. It is, in fact, similar to the New York City and New York State human rights law. It is. No, absolutely. It's similar in the sense that, obviously, oftentimes these claims are litigated together. But there are distinct differences. And one of the, I mean, the New York State court, for example, really did not address the fact that plaintiffs raised concerns with the fact that the layoffs violated New York State civil service law. The evidence shows that defendants admit they did not, you know, lay off temporary workers first or in any way go by seniority, which is what New York State civil service law requires. We, again, would submit to a State court that that violation of civil service law makes the legitimacy of the decision impossible. So — Go ahead. I'm sorry. I thought it was kind of a no longer an open question as to whether State civil service laws apply to employees here in this entity. Am I — is that an open — is there actually room to make that argument, that they're subject to State civil service laws? They absolutely are, yes. The employees of HHC in the City of New York — Do you have some authority for that? I don't have it right here, Your Honor. I apologize. We'd, of course, be happy to submit that authority later on. That — noticeably, that argument was not raised below, and the Federal court just ignored the argument altogether. And basically, the Federal court determined that the — So the City cited law below that the Health and Hospitals Corporation was exempt from those provisions that I think you're relying on. I apologize, Your Honor. I don't have that citation in front of me. That's only one example. I'm happy to go into other examples as well. Sure. The critical issue was whether there was a — for the disparate impact claims. Right. Whether it's State, Federal, or City law was whether there was a specific policy that created a disparate impact. That's right, Your Honor. And the — And the district court held that the plaintiffs failed to specify any specific policy or practice. Let me just clarify that slightly. The district court said that the plaintiffs have identified a policy, the decision to only terminate Group 11 non-unionized employees and not to at all consider Group 12 unionized employees. The district court said that is a policy, but we — but the court believed that that was a legitimate distinction to be made. The problem with that is that they misinterpreted the evidence. The court basically felt that — or the court believed the representations that Group 11 and Group 12 are completely separate and cannot at all do the same work or hold the same title. And Defendant's 30 v. 6 witness admitted that a Group 11 and a Group 12 employee could hold the same title, be doing the same work. And a Group 11 employee, even though they may be considered managerial because they're not union members, they could, in fact, be working on the front line. One of the plaintiffs in this case, Gene Phipps, was a Group 11 employee who was working as a nurse educator. She was Group 11, and her other nurse educator colleagues were Group 12. So she was terminated even though she was doing the same work as them, held the same title as them. So, again, the court did identify a policy but then misapplied the facts and the evidence in determining whether or not there was a disparate impact there. Plaintiff's expert did find that there were disparities when we look at the decision to only terminate Group 11 and not Group 12. Dr. Thompson did find problems there. Let me ask about that. Even if that's right, why isn't the decision to protect unionized positions a nondiscriminatory, legitimate business choice? So, Your Honor, there is evidence in the record that says that the fact that they were union members was part of the motivation. The problem here is that when we look at the demographic makeup of the union members and the demographic makeup of the folks who were, when they were hired, were put into the nonunion positions, the nonunion positions who were terminated are significantly older and more people of color, right? So on its face, having union membership and having the protection of a collective bargaining agreement could seem legitimate. But when you then look at who's placed into Group 12 and who's placed into Group 11 and we see disparities, it ends up having a disparate impact. Right. But that's, so you're basically arguing that the disparate impact factor, which would be kind of the first one you would walk through in the analysis. Right. And then you would get to, even if there's disparate impact, is there a business reason for doing that? Right. And if the answer is yes, then is there a nondiscriminatory way that serves the same business goals? And so if the defendant said, yeah, our business, it's not just that we want to favor Group 12 over Group 11, we want to favor people who are in the union, the way that you've answered my question as to whether that's a legitimate business process is to say no because there's disparate impact. But to get to that step in the analysis, we already have a disparate impact. So I don't feel like your answer responds to my question. Sure. No. And let me just clarify in terms of the burden shifting. Once plaintiffs raise an inference of discrimination, yes, the defendants could argue the decision was legitimate because we want to protect unionized workers. But then when the burden shifts back to the plaintiffs to show pretext, and we see that there were different motivations being given at different times. Right. At first, there was the mayor's pledge to protect the unions. But then in the papers below, defendants actually shied away from that, and defendants in this action gave the reason that they were trying to protect front-line workers. So these shifting justifications can also be evidence that should go to the trier of fact to determine whether any one of those descriptions, whether it's unionized workers, front-line workers, is actually pretext. And in reality, what was happening here was unconscious bias against the older workers and the people of color who were in group 11. Can you remind me where in the record the evidence is that you say establishes a prima facie case of disparate impact with respect to that policy or process? Sure. I see I'm out of time. If you'd like me to point you to that when I'm back on rebuttal, I can look for it while I'm sitting down. Yes. Okay. Great. Thank you. All right. Thank you. We'll move to the next rebuttal comment. May it please the Court, Jeff Kerfman on behalf of the New York City Health and Hospitals Corporation. The district court properly granted H&H summary judgment on plaintiff's disparate impact claims under the state and city human rights law, as well as their disparate treatment claim under the state law. This Court should affirm. At the outset, Judge Shin, as you emphasized, plaintiffs have made no effort on appeal to demonstrate an abuse of discretion in exercising supplemental jurisdiction under the relevant standard. But even moving to their de novo analysis, beginning with the disparate impact claims under the state human rights law, the district court properly concluded that plaintiffs failed to identify any material dispute for trial. The MEIIs, either together or in isolation, do not qualify as a specific employment practice as they were required to prove in their prima facie case. Each MEII followed different approaches and included numerous discrete elements that could have been separated out for analysis. Can I ask a question about that? I understand your argument as it relates to the state claim. I'm struggling a little bit more with that in connection with the city claim. Do we have any state law decisions that tell us that the disparate impact analysis under the city framework, which is worded differently from the state, is in fact analyzed the same as to policy and practice? Certainly, Your Honor. I'd make three points. I want to hear your points, but I really want to hear whether you have any cases that are state law cases that say that. We don't have a state law case unpacking that provision. I believe you're referring to the provision stating that groups of policies and practices can suffice. I would make three points in response. Number one, the plaintiffs have never attempted to tie any of the practices at issue here into the group language under the city law. I don't think they've pressed that. The city law specifically says that they're not required to tie specific policies or practices within the group to the disparate impact, right? That's what makes the city law different from. We've got kind of a tradition here of the federal courts, in good faith, applying federal ideas to the state and city laws. We've seen changes in those laws that tell us, please stop doing that. I'm just wondering whether you're asking us to do that again. Certainly. I'd make two additional points. Number one, I think looking at the language of the city law, I think there's still an implied requirement that the plaintiffs need to identify the specific policies or practices that comprise the group that they are relying on, because otherwise the role of a policy or practice sort of disappears from the  Employers are always operating based on policies or practices. But secondarily, I think the court doesn't necessarily need to reach that issue because even under the city law, the plaintiffs were required, excuse me, H&H came forward with a valid business justification for the MEIIs and for the decision to exclude group 12 employees. Plaintiffs were then required to rebut that justification by pointing to a policy or practice that would achieve the same objectives without having a disparate impact. They haven't presented any evidence on that point. What's the status in terms of the state claims now, and I suppose persuasively for the city claims of the analysis and Watson that basically says an undisciplined system of subjective decision-making if it leads to disparate impact, then it's fair game for a disparate impact claim, which is I think kind of your defense here. This is a, this is a discretion infused dispersed decision-making process. So in terms of Watson, the court there was clear that although a plaintiff can in certain cases use subjective decision-making to make out a, to make out a disparate impact claim in cases where a decision-making process involves points of discretion and objective standards and factors, the plaintiff is still required to identify the specific employment policies or practices that they're relying on. I think that's. The facts of that case, I thought were that the bank had a sort of ill-defined process whereby individual supervisors made promotion decisions based on their familiarity with the individuals involved, which sounds a lot like, I mean, it feels like if anything, there's more guardrails on this process than there were there. And we vacated, we know, the Supreme Court vacated and sent it back to look at the evidence of disparate impact, which it wouldn't have done if that kind of disparate exercise of discretion had been eligible for a disparate impact claim. I'm just trying to, I mean, I don't know whether subsequent case law has changed it or whether the statutory amendments have changed it. I don't know if you have a position on that. Well, I think the critical distinction here is that in Watson, my understanding was that the entire practice that the plaintiffs were relying on was an exercise of discretion, that the entire process was discretionary. Here, the process did involve points of discretion, but it also involved objective standards and practices. For example, the plaintiffs point to the decision to exclude group 12 employees. And I think in Watson, the court indicated that in that circumstance where you have both discretionary practices and objective standards that are being applied, it's important to separate out which specific employment practices the plaintiffs are relying on because otherwise you run the risk of sort of a myriad of innocent exercises of discretion that aren't part of the employer's policy being used to hold the employer liable. Although I think the court said if an employee, if an employer's undisciplined system of subjective decision-making has precisely the same effects as a system pervaded by impermissible intentional discrimination, it is difficult to see why Title VII's proscription against discriminatory actions should not apply. If I'm following, Your Honor, I still don't think that that describes the set of practices that we had at issue here where- It's a mix. I thought you were going to say, because the Heartland case for disparate impact is you have entirely objective. It's a test or something like that. And so I think what I'm hearing you say is you need that, or Watson says it can be entirely discretionary and you could apply disparate impact, but if it's a mix of the two, you can't. Is that sort of where you are? I think the language in Watson is clear that if it is a mix of the two, the plaintiff still needs to identify the specific employment practice that they're relying on. But I would emphasize again that even if you were to get past Watson and identifying the specific practice that is at issue, there again, we have H&H coming forward with a valid business justification that the plaintiffs make no attempt to rebut. If I could, just two further brief points. Number one, as the Court alluded to, there is no authority applying the New York State civil service law to H&H. And as we cited in our brief, HHC versus counsel, the civil service laws do not apply to the Health and Hospitals Corporation. I'd also point the Court to the New York Court of Appeals decision in Burns versus Quinonez, which held the same. If the Court doesn't have any further questions, we'd ask that you affirm. All right. Thank you. Thank you, Your Honors. And Judge Robinson, to address the question we left off on in terms of the evidence that Prima Fascia is showing at the outset, plaintiff had an expert report that showed statistically significant disparities. Could you point me to the record to where? Sure. It's ECF 106-6. That was the initial expert report. ECF 106-8 was plaintiff's expert rebuttal report where he confirmed that even when he performed the analysis in the way that defendant's expert said he should have, he still found statistically significant evidence of disparities. So can I ask about that?  I wasn't sure whether that's what you were going to rely on. Sure. In the first test, am I right, that it became apparent that the data set was, there was double counting? There was, yes. And so the first analysis, which was more detailed by a lot, couldn't be relied upon because the data was faulty. And so the second analysis, the expert came back and said, okay, I've now relied on a proper data set and here are my five conclusions. Is that about, am I remembering? Absolutely, yes. And in the second one, there's no, there's none of the reasoning to explain how the data ran. It was just, here's my conclusion. And so I'm wondering whether an expert that says, I ran the numbers and I concluded there's disparate impact. Is that a prima facie case or do we need a little flush in there? Understood, Your Honor. After the rebuttal report where Dr. Thompson clarified that, you know, the way in which he received the data was confusing. It was kind of double produced and therefore he accidentally double counted it. He then sat for a deposition. So, right, there, I don't actually have, I apologize, I don't have the deposition site, but I could submit that as well. But, yeah, Dr. Thompson sat for a deposition. If defendants, you know, had any questions about the second set of analysis, it could have been certainly dealt with then. Well, no, it's not whether they dealt with their questions. I guess I'm asking you, it's your burden to present the prima facie case. And so I'm asking, I guess, whether you view the report at 106-A, the rebuttal report, as sufficient to establish your prima facie case or whether there was additional analysis that was developed in the deposition that takes us further that we should know about in order to evaluate whether you've made a prima facie case. There is, Your Honor. And I think what Dr. Thompson probably should have done in the rebuttal report is explain that he went through the exact same analysis once the errors with the data were corrected. And so perhaps in shorthand, he said a bit too little in the rebuttal report, but I think what he explained in his testimony is that he, again, walked through the exact manner of analysis that he had performed, that, you know, it was just as detailed and, you know, just as appropriate, you know, in order to show that there was statistical significance. So the short answer is yes, but I see I'm out of time, so I don't want to clarify too much. Thank you very much. All right. Thank you. And thank you to both of you. We will take the case under advisement.